# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------X

COMPASSIONATE LIVING, a Not-For-Profit
Corporation,

                Plaintiff,

    v.

VITAL FARMS, INC.,

                Defendant.

-----------------------------------------------------------X

Index No.:

**SUMMONS**

The bases of venue are Plaintiff's designation and events or omissions giving rise to the claims.

Plaintiff's residence:
Compassionate Living: 5008 Lent Ct., Elk Grove, California 95758.

To the Person Named as Defendant above:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff at the address set forth below, and to do so within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Note:  The law or rules of court provide that:

a) If this summons is served by its delivery to you or (for a corporation) an agent authorized to receive service personally within the State of New York, you must answer within 20 days after such service; or
b) If this summons is served otherwise than a designated in subdivision (a) above, you are allowed 30 days to answer after the proof of service is filed with the clerk of the court.
c) You are required to file a copy of your appearance together with proof of service with the clerk of the court of the court in which the action is brought within ten days of the service of the appearance.

Dated: June 10, 2022

Defendant's address:

Vital Farms, Inc.
3601 S. Congress Avenue, Suite C100
Austin, Texas 78704

Jesse Langel, Esq.
The Langel Firm
Attorney for Plaintiff
30 Wall Street, 8th Floor
New York, NY 10005
646-290-5600
jesse@langellaw.com

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 4 of 56

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------X
COMPASSIONATE LIVING, a Not-For-Profit                     Index No.:
Corporation,

        Plaintiff,

    v.                                                **COMPLAINT AND DEMAND FOR
                                                                        JURY TRIAL**

VITAL FARMS, INC.,

        Defendant.
----------------------------------------------------------X

## I. NATURE OF THE CASE

1.    COMPASSIONATE LIVING ("Plaintiff") brings this action under NYGBL § 349 (Deceptive acts and practices unlawful), NYGBL § 350 (False advertising unlawful), and common law fraud.

Defendant, VITAL FARMS, INC. ("Defendant"), centers its marketing around its claimed ethics in its mass production of eggs, butter, and ghee. Its stated mission is to "bring ethical food to the table" as an "ethically minded food company" "exemplified" by its "humane treatment of animals."

But through its barrage of false advertising, euphemisms, and marketing gimmicks, Defendant "drowns atrocity in language perfumed with rosewater" to use the words of neuroscientist, Georges Chapouthier. Defendant's "ethics" and "humane" centered advertising, known as "humane-washing," perpetuates a false narrative that obstructs plaintiff's mission, diverts its resources, and produces traceable injuries to this organizations and to the individuals it represents.

Plaintiff's mission is, in part, to counteract the inherently *unethical* practices of egg and dairy production, which involve: artificial insemination, forced reproduction, intensive breeding, culling (killing), intensive confinement, mutilation, forced reproduction, depopulation (mass

Case 1.22-cv-05545-GHW Document 1-1 Filed 06/29/22 Page 5 of 56

killing), and premature slaughter. Hidden cruelty is baked into Defendant's business model. These acts are not "ethical" or "humane" under any reasonable consumer standard. No quantum of false advertising can change this reality.

As the world is gripped by another avian flu outbreak, Defendant admits (Exhibit 1) to keeping all of its of its hens indoors—a fact that flatly contradicts its most prominent claim of "pasture raised." Defendant continues to sell hundreds of millions of eggs using this animal-raising claim that it knows to be false. In so doing, Defendant continually fails to comply with FSIS labeling guidelines that require truthful and non-misleading labeling. To make matters worse, Defendant continues to deceive the public using outdated or nonexistent video clips of hens outdoors during this time of outbreak. Millions of egg cartons are being sold with "See a Farm" advertising, which Defendant knows leads consumers to false, outdated, or non-existent videos with hens allegedly outside on pasture.

The parties' competing missions place them within each other's zone of interest. Each party has national or global reach. Each party seeks to persuade the same audience in matters of animal ethics. Plaintiff espouses compassion towards animals for charitable purposes. Defendant massacres millions of animals for profit. As a public benefit corporation claiming to bestow public benefits in animal welfare, Defendant is answerable for legitimate challenges to the contrary.

## II. PARTIES

2. COMPASSIONATE LIVING is a not-for-profit corporation organized and existing under the laws of California.

3. COMPASSIONATE LIVING is a citizen of California.

4. COMPASSIONATE LIVING's principal place of business in Sacramento County, California.

5. COMPASSIONATE LIVING is an organizational plaintiff.

4

6. Defendant is a public benefit corporation organized and existing under the laws of Delaware.

7. Defendant is an authorized foreign business corporation operating in New York under the fictitious name, "Vital Farms Products" with an identification number issued by the New York Department of State.

8. Defendant's business headquarters is located 3601 S. Congress Avenue, Suite C100, Austin, Texas 78704.

9. Defendant's principal place of business is located 3601 S. Congress Avenue, Suite C100, Austin, Texas 78704.

10. Defendant is a "B Corporation."

11. A "B Corporation" is a for-profit company that received a private certification for "social and environmental performance."

12. According to its 2021 FORM 10-K statement, Defendant elected to also be treated as a "Public Benefit Corporation" under Delaware law.

13. A Public Benefit Corporation must be operated to achieve a general public purpose while generating a profit for its shareholders.

14. Benefit corporations face additional compliance and governance obligations.

15. Some states require a "benefit director" to ensure that the Public Benefit Corporation meets its stated public purpose.

### III. JURISDICTION AND VENUE

16. Defendant regularly does business within this county and state.

17. Defendant derives substantial revenue from goods sold in this county and state.

18. Defendant expected or should have reasonably expected the acts alleged in this complaint would have consequences in this county and state.

5

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 7 of 56

19.     Defendant derives substantial revenue from interstate commerce.

20.     Defendant purposefully avails itself of the privileges and benefits of this district.

## IV.  FACT ALLEGATIONS

**A.     Background of COMPASSIONATE LIVING**

21.     The charitable purpose of COMPASSIONATE LIVING as stated in its Bylaws is to:

> Create a compassionate world where animals are free from human imposed suffering by promoting lifestyles which support and protect animals and by sharing the benefits of a plant-based diet through education and outreach.

22.     On its website, COMPASSIONATE LIVING declares that its purpose is to:

> To create a just and compassionate world where farmed animals are free from human imposed suffering by supporting and promoting the benefits of a vegan lifestyle for the planet, for the animals, for justice, and to support and help build a more sustainable, equitable, and non-violent world.

23.     COMPASSIONATE LIVING's Executive Director is Hope Bohanec, who has been active in animal protection and environmental activism for 30 years.

24.     Mrs. Bohanec has published the book *The Ultimate Betrayal: Is There Happy Meat*?

25.     Mrs. Bohanec is the Executive Director of COMPASSIONATE LIVING and the host of the *Hope for the Animals* Podcast.

26.     Mrs. Bohanec co-founded the Humane Hoax Project, the Ahimsa Living Project, and has organized hundreds of online and in-person events.

27.     The Humane Hoax Project, founded by Mrs. Bohanec, seeks to educate the public about the animal-production industry's manipulation of language and imagery to conceal the truth.

28.     For example, the Humane Hoax Project seeks to expose the inherent contradictions of humane-washing such as "humanely raised" or "certified humane" in the context of the inherently inhumane practice of intensively confining and prematurely killing sentient beings.

29.   Over the last three decades, Mrs. Bohanec has worked for two national non-profit organizations: a) United Poultry Concerns, and b) In Defense of Animals.

30.   Mrs. Bohanec has contributed chapters to two anthologies relating to animal abuse.

31.   The Hope for the Animals Podcast has at least 178 New York listeners and/or subscribers with over 15,000 downloads.

32.   In 2021 and 2022, COMPASSIONATE LIVING, through Mrs. Bohanec, has given at least eight presentations discussing the uniquely problematic and allegedly false advertising of Vital Farms' packaging. Each presentation involved preparation, including research, designing slides, and creating content. Team meetings relating to that content were held before and after each presentation.

33.   Before this action, COMPASSIONATE LIVING has not undertaken civil litigation to carry out its mission.

34.   COMPASSIONATE LIVING has never brought a civil lawsuit against any defendant for the relief sought in this complaint.

35.   This lawsuit is a diversion from COMPASSIONATE LIVING's ongoing, operational activities.

36.   Animal ethics and compassion for animal suffering are values that drive Plaintiff towards its mission to protect the welfare of animals while educating the populace about suffering through exploitation.

37.   Ethics, particularly animal ethics, is central to Plaintiff's mission.

38.   Plaintiff seeks to promote the achievement of animal ethics, impartial justice, and compassion toward all sentient beings.

**B.     Background of Defendant Vital Farms, Inc. and the Egg-Laying Industry**

39.   Vital Farms was formed in 2008 by Matt O'Hayer.

40.     O'Hayer previously founded a travel bookings company in 1998 that went into a "friendly foreclosure" after 9/11.

41.     Post foreclosure of that company, O'Hayer spent the next five years living on a catamaran selling vacation charters.

42.     Vital Farms was launched in part to capitalize on a growing movement of consumer awareness in agricultural practices.

43.     O'Hayer elected to capitalize on the fact that only a few grocery chains were selling eggs with the animal-raising claim of pasture raised.

44.     O'Hayer decided to concentrate selling eggs using the animal-raising claim of "pasture-raised."

45.     A 2013 flood destroyed O'Hayer's Austin farm, which prompted O'Hayer to sell that land and focus on marketing instead of farming.

46.     As Defendant's sales started to increase, O'Hayer decided to focus on marketing Defendant's eggs rather than farming hens to produce them.

47.     O'Hayer then started a network of farms to raise the hens to produce Defendant's eggs.

48.     To enhance Defendant's marketing activities, O'Hayer and Defendant hired a veteran wildlife videographer as director of Defendant's brand.

49.     O'Hayer and Defendant staged exclusive dinners with social media influencers, and created campaigns like a 2017 Youtube series on "Bullsh*t Free Eggs" (viewed at least 2.4 million times) and "Bulls*t Free Kitchens" (viewed at least 7.1 million times). The main goal, proclaimed O'Hayer, is to connect with Millennials, saying "That's where the growth is in this category."[1]

---

[1] Chloe Sorvino, *How Whole Foods Favorite Vital Farms Made Pasture-Raised Eggs Mainstream*, Forbes, May 18, 2018.,

8

50.     According to that same article,[2] the keys to Vital Farms' success were "[t]he marketing and creative financing scheme that have allowed O'Hayer to carve out a niche in the more than $5 billion egg industry."

51.     Deciding to market the eggs as "pasture-raised" has allowed it to grow "beyond Whole Foods and figured out how to get mainstream consumers—in chains like Amazon Fresh, Kroger, Walmart, and Target—to pay artisanal prices, as much as $8 a dozen (more than four times as much as the cheapest carton at Walmart)."[3]

52.     Vital Farms went public in 2020.

53.     O'Hayer's shares in Vital Farms became worth almost a half a billion dollars.

54.     Vital Farms was O'Hayer's second IPO.

55.     According to that same article, O'Hayer "has plans to expand the sale of butter from pasture-raised cows, and he grins at the thought that Vital Farms has already exceeded his expectations. O'Hayer continued, "when I stopped looking for the payoff, the big bucks" he says, "that's when I had the biggest success that I've ever had."[4]

56.     As of April 2, 2020, according to Forbes, Vital Farms is "[n]ow the largest pasture-raised egg brand in the U.S..."[5] In this article, O'Hayer proclaimed that "[t]he company's success proves that more ethical standards, like paying farmers and plant workers at a premium and not using futures contracts to hedge on prices, are appealing to consumers—and investors."[6]

---

https://www.forbes.com/sites/chloesorvino/2018/05/18/how-whole-foods-favorite-vital-farms-made-pasture-raised-eggs-mainstream/?sh=197dd706eca9.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] Chloe Sorvino Forbes, *Vital Farms' Blockbuster IPO Proves Wall Street Has an Appetite for Sustainable Farming*, Forbes, August 2, 2020, https://www.forbes.com/sites/chloesorvino/2020/08/01/vital-farms-blockbuster-ipo-proves-wall-street-has-an-appetite-for-sustainable-farming/?sh=1ea1417e345b

[6] *Id.*

9

57.     O'Hayer's motive matches that of Fred C. Hayley, the director of a U.S. egg-producing company with 225,000 laying hens: "The object of producing hens is to make money. When we forget this objective, we have forgotten what it is all about."[7]

58.     Absent from O'Hayer's stated ethical standards in the preceding articles were any appreciable detail of the treatment of the animals being used.

59.     Defendant owns "Egg Central Station," a shell-egg processing facility owned and operated by Defendant in Springfield, Missouri.

60.     Defendant's Egg Central Station enables it to pack approximately three million eggs per day.

61.     Each of Defendant's hens are designed to lay an egg every 28 hours or so.

62.     Defendant's hens are not born in a nest with their mother hen.

63.     Defendant's hens are born in metal or plastic drawers, frightened and alone, without a mother's hen's love and care.

64.     Defendant is in the female business. Every male bird born as part of Defendant's operations are killed ("culled").

65.     On its website[8], defendant admits that it "does not own or operate a hatchery of our own or control the means of culling that the hatcheries use" but that it advocates "for a more ethical food system, which includes doing what we can to identify alternatives to male chick culling."

66.     Some ways in which male chicks born to egg-laying hens ("layers") are culled by the following methods:

   a) sucked through a series of pipes onto an electrified plate;
   b) tossed into large plastic containers or garbage dumpsters where some are trampled and suffocate. All are left to die slowly of exposure and/or dehydration;
   c) sent fully conscious through macerators (grinders);
   d) drowned in foam; and/or

---

[7] Poultry Tribune, November 1986.
[8] https://vitalfarms.com/faqs/

e) gassed with $CO_2$.

67. Defendant contracts with approximately 275 independent farmers who raise and care for the hens that lay Defendant's "pasture-raised" eggs.

68. Defendant's hens are used to lay eggs for approximately 1.5 years.

69. Defendant's hens' average life spans of 1.5 years are shorter than the industry standard.

70. The natural life span of a hen is 10-20 years.

71. Domesticated hens' ancestors, Red Jungle fowl, lay approximately 25 eggs per year.

72. In contrast, Defendant forces its young hens to lay nearly 300 eggs per year.

73. After laying nearly 600 eggs in under two years, Defendant's hens' bodies are ravaged, many of whom have bones as brittle as potato chips.

74. After about 1.5 years of laying eggs (approximately 500-600 in quantity), the hens' bodies start to produce less.

75. Defendant's hens are production machines whose purpose in life is to churn out supernatural quantities of eggs before an early death.

76. Rather than slow its production of eggs by using hens who lay fewer eggs, Defendant prefers to kill the young hens and replace them with new ones.

77. Hens that lay fewer eggs are considered by Defendant to be "spent" and therefore economically worthless.

78. Laying hens get so big and heavy that if they are allowed to move about, up to 86 percent will fracture their keel bone – the bone to which their breast muscles bind. Even after the fractures heal, the hens' movement is reduced while they suffer ongoing pain.

79. After having been "spent," hens' bodies are barely useable for soups, processed meats, and animal feed.

80. Slaughtering plants pay companies like Defendant two to three cents per slaughtered hen.

81. If spent hens are not sold to slaughter plants, they may be left to die in landfills, garbage dumps, or pits.

82. A percentage of hens forced into reproduction, like those raised by Defendant and its growers, develop uterine prolapse—a condition that causes the uterus to be pushed outside of the hens' bodies.

83. In commercial egg-laying operations, hens are often stressed by the use of artificial lighting to prolong laying hours.

84. Defendant's hen death-loss rate is 6-8%,[9] which is higher than the industry average.

85. A high death-loss rate among hens is an indicator of poor welfare.

86. High stocking density contributes to a high hen death-loss rate.

87. Other causes for Defendant's higher-than-average death-loss rate for hens are diseases such as coccidiosis, respiratory diseases, and salmonellosis.

88. As alleged below, the current highly-pathogenic avian-influenza outbreak has increased Defendant's hens' death-loss rate.

89. The practice of confining hens contributes to their high death-loss rate due to spreading of disease.

90. There is an inverse relationship between accelerated growth and disease resistance, which means that faster-growing hens are more susceptible to illness.

91. Poor management of cage-free flocks also contributes to high hen mortality.

92. Defendant's high hen death-loss rate means that some hen flocks suffer more than other flocks at Defendant's growers' operations.

93. Defendant "trims" or "tips" the beaks of its hens, which means it cuts or burns off a percentage of the hens' beaks.

---

[9] https://www.cornucopia.org/scorecard/eggs/vital-farms/

12

94.     Beak trimming, also known as "debeaking," especially for "severe" beak trimming, is an industrial practice to prevent feather pecking and cannibalism.

95.     Feather pecking and cannibalism result from extreme anxiety, fear, and psychological stress as a result from intensive confinement and from being deprived of natural behaviors.

96.     Beak trimming is painful for the hens.

97.     Beak trimming is done without anesthesia.

98.     A baby chick's beak is known to have an extensive nerve supply and is a complex, functional organ.

99.     A hen's beak is a multipurpose organ playing a vital role in a variety of functions, including feeding, drinking, playing, grasping objects, mating, nesting, preening, and defense against predators and parasites.[10]

100.     Some physiological changes can occur in the cut nerves and damaged tissue in a baby chick's beak, which can lead to acute and long-term pain. This in turn can lead to behavioral issues, reduced social activity, lethargy and changes to guarding behavior. It can also result in reduced feed and water intake and thus dehydration and illness due to a weakened immune system.

101.     Defendant's or its suppliers' practice of beak trimming is an implied admission that its business practices impose the above conditions on their flocks.

102.     Defendant's or its suppliers' practice of beak trimming is an implied admission that they intensively confine hens.

---

[10]

https://pubmed.ncbi.nlm.nih.gov/33579650/#:~:text=The%20avian%20beak%20is%20a,between%20the%20bird%20and%20feed.

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 15 of 56

103.    Upon information and belief, in its contracts with its independent farmers, Defendant sets forth essential terms such as price to paid for eggs, the duration of the contract(s), and the manner in which the hens are to be cared for.

104.    Upon information and belief, Defendant's contracts with its farmers reserve the right for Defendant to depopulate (slaughter) the farmers' flocks if the production and sale of these eggs are no longer profitable to Defendant.

105.    Upon information and belief, Defendant reserves the right to indiscriminately cause the slaughter of the farmers' flocks based on economic principles, such as supply and demand, that Defendant deems beneficial to its business interests.

106.    Upon information and belief, Defendant has exercised its right to cause the depopulation of birds or flocks based on its business interests.

107.    Upon information and belief, Defendant has entered the property of several of its contract farmers and slaughtered thousands of hens who were neither sick nor injured, and did so purely for business reasons.

108.    Upon information and belief, Defendant inhumanely depopulates its farmers' flocks through $CO_2$ gassings.

109.    It is well understood that killing animals by $CO_2$ inhalation is a painful, prolonged, and stressful way to die.

110.    If Defendant's practices were committed against dogs, or other companion animals, Defendant could be guilty of animal cruelty under various, state anti-cruelty statutes.

111.    Defendant and its growers escape liability for animal cruelty under various Common Farming Exemptions (CFE's).

**C.      Vital Farms' Representations in SEC Documents (10-K)**

14

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 16 of 56

112.    In its 2021 Form 10-K filed with the SEC,[11] Vital Farms makes the following

representations:

a) "Our Company: Bringing Ethical Food to the Table."

b) "Vital Farms is an ethically minded food company"

c) "We're on mission to bring ethically produced food to the table."

d) "Vital Farms is an ethical food company that is disrupting the U.S. food system."

e) "This framework has enabled us to become the leading U.S. brand of pasture-raised eggs and butter and the second largest U.S. egg brand by retail dollar sales."

f) "Our ethics are exemplified by our focus on the humane treatment of farm animals and sustainable farming practices."

g) "We believe these standards produce happy hens with varied diets, which produce better eggs."

h) "There is a seismic shift in consumer demand for ethically produced, natural, traceable, clean label, great-tasting and nutritious foods."

i) "Our business decisions consider the impact on all of our stakeholders, in contrast with the factory farming model, which principally emphasizes cost reduction at the expense of animals, farmers, consumers, crew members, communities and the environment."

j) "We primarily work with our farms pursuant to buy-sell contracts. Under these arrangements, the farmer is responsible for all of the working capital and investments required to produce the eggs and manage the farm, including purchasing the birds and feed supply. We are contractually obligated to purchase all of the eggs produced by the farmer during the term of the contract at an agreed upon price that depends upon pallet weight and is indexed quarterly in arrears for changes in feed cost."

**D.    Vital Farms' Ethics and Humanness claims in Other Marketing Channels**

113.    On the website of certifiedhumane.org,[12] Certified Humane® states the following as

Defendant's mission:

---

[11] 2021 10-K Annual Report. https://investors.vitalfarms.com/static-files/7ef846bd-cebd-45eb-bc7f-ec04b9f01d86

[12] https://certifiedhumane.org/vital-farms/#:~:text=Their%20mission%3A%20to%20bring%20high,heart%20of%20Vital%20Farms'%20mission.

15

Their mission: to bring high quality, ethically produced eggs to the table through the humane treatment of their hens through the Pasture-Raised farming method. Animal welfare and the humane treatment of hens remains at the heart of Vital Farms' mission.

114.    In other words, Defendant's entire value proposition is ethics, humane treatment of animals, animal welfare, and pasture-raised hens.

115.    Among Defendant's uniform, widely disseminated misrepresentations on the internet:

**1. Written Claims**:

a)    "We're on mission to bring ethically produced food to the table."

b)    "Vital Farms is an ethical food company."

c)    "THE GIRLS: Our girls supply ethically produced eggs and butter. Our network of family farms gives them the lifestyle they deserve."

d)    "CONSUMERS: You show the industry that ethics matter. We work to bring you joy through delicious food."

e)    "FARMERS: Our farmers put animal welfare at the heart of their operations. We compensate them fairly and provide ongoing support."

f)    "ENVIRONMENT: We're conscious stewards of the incredible gifts of nature, including animals, land, and water. Our farmers do not use pesticides or herbicides on their pasture, and we believe that pasture rotation protects the health of the land."

g)    "Our ethics are exemplified by our focus on the humane treatment of farm animals.**"**

h)    "Vital Farms makes ethical snacking easy."

i)    "Looking for ethically produced food? You've found it."

j)    Vital Farms is "committed to ethical decision-making."

k)    Vital Farms has an "ethical mission."

l)    The "central tenet" of Vital Farm's "mission" is "the humane treatment of farm animals."

m)    Vital Farms acts as "stewards of our animals."

n)    "Our ethics are exemplified by our focus on the humane treatment of farm animals."

16

Case 1:22-cv-05545-GHW Document 1-1 Filed 06/29/22 Page 18 of 56

116.    In every box of Vital eggs contains the "Vital Times," an in-box newsletter, which shows photographs of hens outdoors on green grass. One such newsletter states in relevant part that, "Our farmers are invested in animal welfare and doing things the right way. And we're invested in them. By bringing this carton home, you are too."

117.    In these inserts, Defendant continues to advertise its "mission" and "central tenet" to be the "the humane treatment of farm animals."

**2. Images and Videos**:

118.    On every single page, or on nearly every single page, of Defendant's website appears photographs of hens outdoors.

119.    Most pages contain mixtures of images of the hens with children or farmers.

120.    On the web pages featuring Defendant's butter and ghee products, cartoon images of cows are present.

121.    Defendant sells apparel through its website,[13] including T-Shirts and a hat with the slogan, "Girls on Grass."

122.    Defendant claims to disclose, by video, the farms on which the hens that produced the consumers' eggs.

123.    Defendant's video marketing appears to be a competitive advantage.

124.    On its website, Defendant provides a complimentary video clip[14] of hens allegedly foraging at "Hills & Hollers" farm.

125.    This Hills & Hollers video clip, which is 4:31 seconds, has not been changed in over *a year*.

126.    This Hills & Hollers video clip does not depict reality.

---

[13] https://store.vitalfarms.com/products?s%5Bf%5D%5Bc%5D%5B%5D=%2FApparel
[14] https://vitalfarms.com/farm/hillshollers/

17

127.    As set forth below, these videos remain knowingly false during this current, extended period of a highly-pathogenic avian-flu outbreak.

128.    Defendant continues to induce consumers to buy egg cartons by misrepresenting that consumers can view the farms where hens are allegedly pasture raised.

129.    For example, Defendant still prints on the side of its cartons specific farms thereby inviting consumers to "See a Farm" in Defendant's "Traceability" marketing campaign.

130.    When consumers input a farm, they are served up a video that does not depict reality or are denied access to any video through the message, "when we bring a farm into our farm, it takes some time to gather their video."

131.    Defendant's marketing seeks to address consumer's growing awareness of inhumane treatment of egg-laying hens.

132.    Defendant's advertising of "pasture raised" eggs are a distinguishable variant to conventionally produced eggs.

133.    Other distinguishable variants, or "specialty" eggs, include "cage free" and "free range."

134.    Pasture raised eggs are supposed to come from hens with regular access to vegetation covered pasture, and are supposed to be free to forage for food, socialize, and live a significant portion of their lives outside as chickens were intended to live.

135.    At night time, pasture-raised hens are kept in barns or sheds, away from predators and the elements.

136.    Pasture-raised hens are thought to be nutritionally superior to conventional eggs because a portion of the hens' diets come from natural food sources such as vegetation and insects.

137.    On its website,[15] Defendant claims that its eggs "taste so good because our pasture-raised hens live happy, healthy lives! Our girls' fresh-air lifestyle is full of foraging and feasting on natural goodness, which shines through in every egg."

138.    Defendant's marketing causes it to charge much higher than its competitors—a super-premium price. For example, Defendant's Organic Pasture eggs (12 count) sells from $8.99 to $14.99 depending on the location. Defendant's non-organic Pasture-Raise eggs sell between $5.98 to 12.09. In contrast, 12 eggs distributed by England's Best Eggs ranges from $2.77 to $.581 Rose Acre Farms Grade A eggs sells for approximately $2.89.

139.    Marketing eggs as "pasture raised" significantly impacts price. In 2018, Vital Farms reported that sales of pastured eggs jumped 32%.[16]

140.    Consumers become sold on the idea that chickens that are pasture raised enjoy regular outdoor access, are kept in smaller flocks, receive better treatment, and produce more nutritious eggs because they have more access to a natural diet.

**E.    Why Vital Farms' Representations are False, Misleading, and Deceptive**

**1.    The "Ethics" of Massacring Millions of Animals for Profit**

141.    Carrying on unnecessary mass killings for profit constitute a real challenge to animal ethicists like the plaintiff.

142.    Defendant's use and massacring of hundreds of millions of animals stems from a belief that its business interests are superior to the lives of the animals that it uses and kills.

143.    Defendant views the animals that it kills or causes to be killed as property—not as lives with inherent value, which is fundamentally contradictory to animal ethics.

---

[15] https://vitalfarms.com/faqs/
[16] https://www.fooddive.com/news/its-out-of-the-box-pastured-eggs-could-be-the-new-favorite/542764/#:~:text=Previously%2C%20pasture%2Draised%20eggs%20could,low%20as%20%245%20a%20dozen.

144.    The animals killed for Defendant's business operations have a life.

145.    The animals killed for Defendant's business operations are deprived of a life.

146.    The animals killed for Defendant's business operations are sentient.

147.    Chickens, including hens, are sentient beings.

148.    Cows and calves are sentient beings.

149.    The animals killed for Defendant's business operations are biologically driven to preserve their lives.

150.    The animals killed for Defendant's business operations possess an instinct of self-preservation.

151.    The animals killed for Defendant's business operations have a fundamental, biological purpose to live.

152.    The animals killed for Defendant's business operations have cellular and biochemical mechanisms that allow them to perceive their external surroundings.

153.    The animals killed for Defendant's business operations have brains.

154.    The animals killed for Defendant's business operations have nervous systems.

155.    The animals killed for Defendant's business operations are able to feel pain.

156.    The animals killed for Defendant's business operations have an interest in their physical integrity.

157.    The animals killed for Defendant's business operations are conscious.

158.    Consciousness is eminently useful for the survival of the animals killed for Defendant's business operations.

159.    The animals killed for Defendant's business operations have their own interests linked to their cognitive faculties.

160.   The animals killed for Defendant's business operations have the ability to establish a distinction between what is beneficial to them and what is harmful to them.

161.   Defendant and its agents choose when and how the animals live and die.

162.   The consciousness of the animals killed in Defendant's business operations serve the animals' evolutionary purpose.

163.   The animals killed for Defendant's business operations were capable of feeling emotions.

164.   The animals killed for Defendant's business operations possessed intelligence.

165.   The animals killed for Defendant's business operations adapted evolutionary traits that gave them evolutionary fitness.

166.   The animals killed for Defendant's business operations possess a conscious sense that their life ought to unfold normally in conditions that are appropriate to their nature and to the unique character of their species.

167.   The animals killed for Defendant's business operations depend on the defendant for survival.

168.   Defendant betrays the animals that are killed for its business operations by ensuring that they are killed against their interests.

169.   Like humans, the animals killed for Defendant's business operations brought a unified psychological presence to the world.

170.   Defendant fails to acknowledge the legitimate aspirations unique to the animals—the most fundamental of which is to live.

171.   For profit, Defendant instrumentalizes animals for their labor, secretions, flesh, skin, and bones.

172.   For Defendant's business operations, painful mutilations are inflicted on the animals.

173. Defendant deliberately multiplies DNA for traits that inherently inflict pain and disabilities on the animals.

174. The definition of suffer, an intransitive verb, means: to endure death, pain, or distress.

175. The animals killed for Defendant's business operation at the least endure death, and therefore suffer.

176. To cause another sentient being to suffer for profit is not ethical.

177. Killing, the ultimate act of cruelty, is what matters in animal ethics.

178. Defendant's ethics sloganeering was and is a business decision.

179. Every act of animal cruelty is contrary to human dignity and therefore human ethics.

180. Defendant's operations force animals into existence to use their bodies against their will and then condemns them to death as infants or young animals.

181. Defendant is in a constant state of predation, confinement, forced reproduction, and killing in its business operations.

182. Defendant knowingly multiplies DNA of animals that produces traits that inflict pain, disabilities, and abnormalities.

183. Defendant's financial health is more important than the welfare of its animals used.

184. Exhibit 2 is a copy of the digital article produced by Defendant titled *Lay Thee Down to Rest*.[17] Below is a table illustrating some of its representations with reasons why they are false, misleading, and deceptive:

| Representations: | Why they are false, misleading and deceptive: |
|---|---|
| "When female chicks do grow up and come to our farms, we think they live just about the best life possible for a laying hen to have – acres of open pasture, fresh green grass and the freedom to come and go from comfortable barns as they please." | The hens are not free—they live lives of forced confinement and reproduction, followed by premature death at 1.5 years old against their will. |

[17] https://vitalfarms.com/lay-thee-rest/

22

| | Defendant's hens suffer a higher than average death-loss rate of 6%-8%.[18]<br><br>All hens during current H5N1 outbreak are stuck inside 24 hours per day with zero access to pasture and grass.<br><br>Before the current H5NI outbreak, Defendant's growers used door openings in barns or doors for hens to use but a significant percentage of the hens never venture outdoors. |
|---|---|

185.   The euphemisms in Exhibit 2 establish the type of washing down of the ugly realities of

Defendant's business practices:

| Defendant's Euphemisms: | Why they distort the plain meaning of words as understood by reasonable consumers: |
|---|---|
| "So when retirement time comes, the farmers that we work with have little choice but to retire the flock en masse." | "Retirement" means killing the hen at approximately 1.5 years old after their bodies produce less eggs.<br><br>"Little choice" is misleading because it presents a false choice. Farmers can either not raise the hens, send them to sanctuaries, or raise them to their natural deaths.<br><br>*En masse* means group killings of hens by using carbon dioxide gas, suffocating foam, prolonged heat exposure, dumping, or some other heinous means. |
| "That currently means just one thing – and not to sugar coat it – the flock is euthanized, either on site at the farm or at a nearby slaughter plant."<br>"And while we conduct this process as humanely as we are able, the end result is still, unavoidably, the same." | "Euthanize" is defined by Oxford languages as, "put (a living being, especially a dog or cat) to death humanely."<br><br>"Euthanize" is understood by consumers to be used because of a painful, incurable disease or condition.<br>"Unavoidably" is false, misleading, and deceptive because it infers a lack of choice.<br><br>Defendant has a number of choices to avoid killing the hens. For example, it can choose not to produce animal products, send hens to |

---

[18] https://www.cornucopia.org/scorecard/eggs/vital-farms/

23

| | |
|---|---|
| | sanctuaries, or raise them to their natural deaths. |
| Which is why we are excited as a company to be embarking on a renewed mission to figure out the absolutely best way to treat hens at the end of their laying life. We're seeking input and advice from experts across a variety of fields, and around the world, to gather best practices, assess the most viable alternatives and determine what works the best for the hens, the farmers and the communities at large." | This claim presupposes that the hens must die at the "end of their laying life," which is false as explained above. |

186.    Defendant admits that "economic realities" are the reasons for the hens' premature death.

187.    If Defendant has actually slaughtered hens for no other reason than economic reasons, such as supply and demand, as alleged above, every single claim of "ethics" and ethical" is flatly contradicted, and reasonable consumers would be deceived.

188.    Defendant expressly ties its definition of "ethics" and "ethical" to the humane treatment of animals with claims such as, "[o]ur ethics are exemplified by our focus on the humane treatment of animals."

189.    The defendant's extensive and deceptive marketing scheme across its product lines continues to a) reduce transparency of the real treatment of animals during the animal-production process, oftentimes also considered Concentrated Animal Feeding Operations (CAFOs); b) produce invisibility in its treatment of animals in its business operations; c) alters and maintains false and misleading perceptions, beliefs and schemas relating to the real treatment of animals in animal production; and d) disconnect consumers from the realities of what takes place at CAFOs, in animal production, and in its own business operations.

**F.    Current Avian-Flu Outbreak Flatly Debunks All "Pasture-Raised" Claims**

190.    The world is afflicted by another avian-influenza outbreak that has forced Defendant and

its growers to keep *all* of their hens indoors for the prolonged duration of the current "Highly

Pathogenic Avian Influenza" (H5N1).

191.    The current H5N1 began in January of 2022.

192.    Currently, 40 states now harbor the current avian flu and 35 states harbor poultry

outbreaks. 193 counties are affected with 357 reported outbreaks.[19]

193.    Avian flu, or avian influenza, is caused by infection with avian influenza Type A virus.

The virus naturally spreads among wild birds worldwide and can infect domestic poultry and

other bird and animal species.[20]

194.    When avian influenza A(H5) or A(H7) virus outbreaks occur in poultry, depopulation,

also referred to "culling," or "stamping out" of infected flocks is usually carried out.[21]

195.    Some facts about this current outbreak include the following:

- Some 24 million birds like chicken and turkeys have already been lost, either because they died from the virus or were killed to prevent its spread.
- This bird flu outbreak is unlikely to just burn itself out.
- The bird flu that struck in 2014 and 2015 resulted in the deaths of more than 50 million birds and cost the industry billions of dollars.[22]

196.    Recent, past outbreaks of avian influenza A, include:

- U.S. H5 outbreaks in 2014-2015
- U.S. H7N8 in 2016
- U.S. H7N2 in cats in 2016

---

[19] Centers of Disease Control and Prevention. H5N1 Bird Flu Detections across the United States (Backyard and Commercial). April 15, 2022. https://www.cdc.gov/flu/avianflu/data-map-commercial.html.
[20] Centers of Disease Control and Prevention. Information on Bird Flu. March 14, 2022. https://www.cdc.gov/flu/avianflu/index.htm
[21] Centers of Disease Control and Prevention. Avian Influenza in Poultry (Domesticated Birds). March 9, 2022.
[22] NPR.org. A Worrisome new bird flu is spreading in American Birds and may be here to stay. April 9, 2022. https://www.npr.org/2022/04/09/1091491202/bird-flu-2022-avian-influenza-poultry-farms

25

- H7N9 Outbreak in 2017[23]

197.    An earlier H5NI in 2011, which spread across Asia, the Middle East, Europe and Africa,

had infected 564 people of whom 330 died—a fatality rate of almost 59%.[24]

198.    Because of the spreading of this highly pathogenic disease, Vital Farms must do

something that contradicts the promises that it makes on millions of its packages: It must lock its

hens inside 24 hours per day, possibly for the entire duration of millions of hens' lives. Doing so

undeniably renders false its nationwide marketing campaign of "pasture raised."

199.    Exhibit 1 is a blog post written by Vital Farms dated March 28, 2022. It admits the

following:

> At this time, our veterinary partners, certifying bodies, and state health officials
> have strongly recommended that **we keep our hens indoors**, and we are
> following this guidance. We've also implemented heightened biosecurity
> measures across our network of 275 farms. Because avian influenza is spread by
> wild migratory fowl, **hens with outdoor access could be particularly
> vulnerable**. [emphasis added].

200.    Defendant's chief marketing differentiator is its claim of "pasture-raised" as being

different from free range or cage free. Exhibit 3 is Defendant's claim on an FAQ page on its

website:

### HOW IS PASTURE-RAISED DIFFERENT FROM FREE RANGE OR CAGE-FREE?

> Pasture-raised eggs are laid by hens that spend their days outdoors roaming the
> pastures as they please. Our pasture-raised girls get a minimum of 108 square feet
> EACH – unlike free range and cage-free birds that have far less freedom.  Free range
> hens typically get a minimum of 2 square feet per bird and have limited access to the
> outdoors. Cage-free birds get a minimum of 1.2 square foot per bird and may rarely,
> if ever, see the sunlight. We make sure our girls have access to fresh air and sunshine
> year-round.

---

[23] Centers of Disease Control and Prevention. Past Outbreaks. February 23, 2022.
https://www.cdc.gov/flu/avianflu/past-outbreaks.htm
[24] WHO (2010) Cumulative Number Confirmed Human Cases of Avian Influenza A/(H5N1),
reported to WHO, 9 August 2011, https://www.who.int/publications/m/item/cumulative-number-
of-confirmed-human-cases-for-avian-influenza-a(h5n1)-reported-to-who-2003-2021-15-april-
2021.

> In certain situations, when the health and safety of the girls are at risk, we may have to keep them temporarily indoors. We make these decisions based on state and local guidance as well as the guidance of our veterinary partners and Certified Humane, who audits our animal welfare practices. These situations are rare and only in the event of significant risk to the girls, such as a weather or health emergency.[25]

201.   For the entirety of the avian-flu outbreak, Defendant's three million packed eggs per day are not "pasture-raised" as claimed on its cartons.

202.   The hens kept indoors are subject to the crowding, restricted mobility, filth, fear, and unnatural diets that accompanies being confined.

203.   Under FEED AND CERTIFICATIONS within the same FAQ Page, Defendant asserts:

**WHAT DO YOUR GIRLS EAT?**

> Our hens spend their days foraging in the pastures, seeking out native and seasonal grasses like clover, rye and wild onion. They don't stop with plants though! You'll often catch our girls munching on a grasshopper or snacking on a worm. Alongside the food they forage, our girls receive supplemental feed. The supplemental feed consists primarily of corn and unprocessed soybean meal which the hens need for protein as well as additional natural ingredients including paprika and marigold which, along with their outdoor snacks, provide nutrients and help the hens produce eggs with deep orange yolks that our consumers prefer. Our supplemental feed is developed by an animal nutritionist, ensuring the girls receive all the nutrients they need to support their health, active lifestyles, and overall wellbeing.[26]

204.   Defendant cannot deny that during the entirety of the current outbreak, the hens are not "spend[ing] their days foraging in pastures, seeking out native and seasonal grasses like clover, rye and wild onion."

205.   Defendant's abrupt cutting off all access to pasture for its "pasture-raised" hens present health risks to the hens.

206.   Defendant currently sells millions of eggs per week knowing that every single one of the "pasture-raised" claims on its products are false.

---

[25] https://vitalfarms.com/faqs/
[26] https://vitalfarms.com/faqs/

27

207.    Every other claim related to being pasture raised is similarly false. For example, getting a "third or more" or up to 50% of their diets from organic pastures is false.

208.    During the current outbreak, Defendant and/or its suppliers kill thousands or millions of birds.

209.    If the virus is detected in even one bird in a flock, all the birds in the flock will be killed, even if they live in separate sheds.

210.    Defendant has created a system where this type of tragedy amongst the hens is inevitable.

211.    While confined, Defendant's hens are more likely to engage in panic reactions, such as piling up on each other.

212.    The egg industry, which includes the defendant, contributes to the virus' deadliness because of the intensive confinement inherent in the business.

213.    The avian-flu outbreak causes an increase in the price of eggs because of the foreseeable disruption in supply chains.

214.    Using taxpayer dollars, the United States government has given hundreds of millions of dollars to egg producers like the Defendant to help their businesses.

215.    As of April 27, 2022, the USDA has given to approximately $393 million to the poultry industry for "indemnity, diagnostics, field activities, and other emergency response costs."[27]

216.    Some of the aforementioned expenditures go to "depopulating" (killing) "affected" flocks, disposing of depopulated birds, and eliminating the virus from affected premises.

217.    Similar to the 2015 avian-flu outbreak, mass populations of birds are being gassed in portable chambers, or are being suffocated by water-based foam that is pumped in and swamps the birds. It can take up to 15 minutes for the birds to die.

---

[27] https://www.aphis.usda.gov/aphis/newsroom/news/sa_by_date/sa-2022/hpai-funding

218.    Another cruel way to kill the birds in mass is by ventilation shutdown, or VSD+, whereby heat is pumped into the barns so the birds suffocate to death in increasing temperatures. In this process, birds can suffer for hours before they die of heat stroke.

219.    These mass killings are inevitable in Defendant's business practice of raising more animals with less genetic diversity.

### G.    Defendant's Failure to Comply FSIS Labeling Guidelines

220.    Defendant's false representations as to "pasture raised" amid the current avian-flu outbreak represent violations of FSIS Labeling Guideline on Documentation Needed to Substantiate Animal Raising Claims for Label Submissions.[28]

221.    In order for Defendant to sell its products bearing "pasture raised," Defendant needed to submit additional documentation to substantiate the claim of pasture raised.

Documentation needed:

1. A detailed written description explaining controls for ensuring that the animals are raised in a manner consistent with the meaning of the raising claim that is valid from birth to harvest or the period of raising being referenced by the claim.

2. A signed and dated document describing how the animals are raised to support that the claims are not false or misleading;

3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution; and

4. A written description of the identification, control, and segregation of nonconforming animals/product.

222.    To substantiate the claim of "pasture raised," Defendant needed to show that the hens have "continuous, free access to the outdoors throughout their usual grow-out period."

223.    Any initial substantiated documentation for pre-approval does not apply indefinitely so as to somehow apply when the hens are kept indoors for an indefinite period of time.

---

[28] https://www.fsis.usda.gov/sites/default/files/media_file/2021-02/RaisingClaims.pdf

224.     Defendant failed to inform the USDA, FSIS, AMS and/or the FDA of the untrue

statements on its labeling and containers despite differences in raising from birth to harvest,

tracing, segregation, slaughter, identification, and control.

225.     Instead of updating regulatory authorities and removing its false advertising, Defendant

continues to make representations it knows to be false.

**H.     Defendant's Humane-Washing Misleads Consumers Who Seek Clarification**

226.     Defendant's advertising claims amount to humane-washing. Humane-washing is marking

that companies use to convince customers that their products are sourced from less cruelly

treated animals.

227.     Defendant's humane-washing has risen to a staggering marketing campaign aimed to

subvert plain meanings of words and concepts in order to sway the minds of concerned

consumers into believing that Defendant's practices are aligned with their values.

228.     Marketing gimmicks, euphemisms, false representations (express and implied) take

center stage in Defendant's humane-washing campaign, which appears to produce the illusory

truth effect: repeat a falsity enough times and people start to believe it.

229.     On the one hand, Defendant attempts to show affection by animalizing—or even

humanizing—its "girls" while on the other hand treating them as utilitarian objects of

reproduction and consumption.

230.     Defendant's misrepresentations are contrived to efface consumers' scruples, and aid them

into buying animal products with an untroubled conscience.

231.     Treating animals "ethically" and "humane" in animal ethics would strictly forbid integral

parts of Defendant's business practices including culling, mutilation, intensive confinement,

depopulation, and premature slaughter.

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 32 of 56

232.    Defendant purposefully omits crucial information that reasonable consumers need to assess the truth of its ethics and humaneness claims in their totality. For example, even though Certified Humane® claims to apply its standards from "birth through slaughter,"[29]Defendant fails to convey to consumers information about the inherent practices in transporting and slaughtering hens.

233.    Defendant omits the fact that during transport, hens are crammed in tiny crates without water or food.

234.    Defendant omits the fact that when the hens are pulled out of those crates, the hens may be jabbed with metal hooks to rip them out of their crates.

235.    Defendant omits the fact that if hens are delivered to slaughterhouses during weekends, they can languish on trucks until killings resume on Monday morning.

236.    Defendant omits the fact that slaughterhouse workers hoist hens upside down on shackles while fully conscious on the slaughter line.  After being shackled, the hens are moved through an electrified trough of water designed to paralyze so that their feathers can be more easily pulled out of their bodies.

237.    Defendant omits the fact that every day hens are scalded alive as they are dunked into scorching hot water while conscious.

238.    Defendant fails to convey to its consumers that it kills, or causes to be killed, hens in an archaic process that would be illegal under federal law if the hens were cattle or pigs.

239.    Since the USDA exempts birds from the federal Humane Methods of Slaughter Act—removing them from the law's definition of "animal"—Defendant's laying hens are not required to be rendered insensible to pain before they are killed. Nor is there any federal protection to the hundreds of male chicks that killed for being born male.

---

[29] https://certifiedhumane.org/frequently-asked-questions/

31

## I.    Purported Compliance with HFAC Standards (Certified Humane®) is Immaterial, Conceals Hidden Cruelties, and Violates Plain Meanings of Ordinary Language

240.    Certified Humane® standards for pasture raised eggs were created and adopted by Humane Farm Animal Care, Inc. (HFAC).

241.    Upon information and belief, HFAC earns revenue by collecting a licensing royalty when companies such as Defendant uses the Certified Humane® mark on its products. HFAC earns five cents for every thirty dozen eggs the producers sells with the Certified Humane Label.

242.    HFAC also receives revenue for "Certified Humane" applications, inspections, and certifications.

243.    HFAC receives up to $300 per application, and approximately $600 per day per inspector for any farm inspection.

244.    HFAC also receives donations for revenue.

245.    Upon information and belief, HFAC earns a majority of its revenue through licensing royalties that are directly tied to product sales.

246.    The more sales that Defendant makes using Certified Humane® mark, the more revenue HFAC makes.

247.    The Fourth Circuit Court of Appeals held:

> HFAC's occupies a commercial role in the economic market of humanely produced eggs, and its email was placed in that economic, commercial context. HFAC, and organizations like HFAC, function as a cog in the production and sale of pasture raised eggs; without such certifications, consumers are less likely to trust a producer's practices and pay higher prices. *Handsome Brook Farm, LLC v Humane Farm Animal Care, Inc.*, 700 Fed Appx 251, 260 (4th Cir 2017).

248.    HFAC previously declared, "[p]roducers who are Certified Humane® undergo traceability audits to verify that every egg that goes into every carton that has claims such as free range or pasture raised are verified by our inspectors to be exactly that."

249.    The standards for "humane" production differs among "certifiers."

250.   Certified Humane® exists to help induce sales of animal products.

251.   Through the Certified Humane® logo, Defendant and HFAC make express and implied claims to consumers, retailers, and to the public about animal-raising standards.

252.   As intended by Defendant and HFAC, the public and regulatory authorities rely on the Certified Humane® logo when making material decisions about Defendant's products.

253.   Certified Humane® standards are not enforced by an impartial third party.

254.   Upon information and belief, some of Defendant's growers have not been audited regularly enough by HFAC to warrant the express and implied claims inherent in its logo.

255.   All of Defendant's growers' hens would now fail an audit of HFAC's relating to pasture-raised compliance because all hens are kept inside during the current highly pathogenic avian influenza outbreak.

256.   Certified Humane® is irrelevant to Defendant's "ethics" or "ethical" claims because they do not certify Defendant's ethics or ethical practices.

257.   Neither "ethics" or "ethical" appear once in HFAC's "Animal Care Standards" of 2018, updated August 13, 2020 that appear on its website.[30]

258.   Reasonable consumers acting reasonably would expect that "Certified Humane®" supports Defendant's claimed "ethical" practices given that claim's placement throughout its humaneness advertising.

259.   The Certified Humane® logo represents a contradiction of terms that causes consumers moral confusion.

---

[30] https://2gn8ag2k4ou3ll8b41b7v2qp-wpengine.netdna-ssl.com/wp-content/uploads/Std19.Layers.4H-1.pdf

33

260. The use of the words "certified" and "humane" together in the same phrase is a contradiction of plain meaning as would be understood by reasonable consumers acting reasonably.

261. HFAC ignores the most fundamentally wrong—and therefore immoral—acts committed against the animals: loss of liberty, pain, and loss of life.

262. Defendant uses Certified Humane® to emphasize non-essential welfare issues in order to mislead consumers into believing that it emphasizes essential welfare issues.

263. HFAC and Certified Humane® fail to adequately consider or address the emotional harms of separation, bereavement, and betrayal, which reasonable consumers consider material when interpreting the plain meaning of "Certified Humane" in animal welfare.

264. HFAC and Certified Humane® fail to adequately consider and address the psychological trauma caused by terrors at the slaughterhouses, which reasonable consumers consider material when interpreting the plain meaning of "Certified Humane" in animal welfare.

265. Express and implied messaging of Certified Humane® mislead reasonable consumers because they are subject to differing interpretations at least one of which violates plain meaning of "humane" as understood by ordinary consumers.

266. Certified Humane® presumes compliance and enforcement to reasonable consumers, which, upon information and belief, are lacking for significant percentages of dead, dying, diseased, and lame animals that are inherent in Defendant's business operations, especially during the course of the current highly pathogenic avian-flu outbreak.

267. Defendant and HFAC make arbitrary choices as to what is prohibited and permissible forms of violence against its animals, which misleads the reasonable consumer into adopting that deceptive rationale because it is "certified."

268.    Certified Humane® reflects marginally improved conditions, and distracts the public from the inherent cruelties of Defendant's business operations.

269.    HFAC's purported standards do not morally or ethically justify Defendant's advertising claims.

270.    HFAC worsens animal treatment by leading to more suffering, more mutilations, more disease, more confinement, more trauma, more killings, and more bereavement.

271.    HFAC does not define the term "ethical" in Defendant's certification.

272.    HFAC's and Defendant's definitions of "ethical" or "ethics" or "humane" differ from their plain meaning as understood by consumers.

273.    Regardless of any Certified Humane® logo, Defendant's use of "ethics" and "ethical" violates their plain meaning as understood by reasonable consumers.

274.    Neither HFAC standards nor its "Program Policy Manual"[31] mention anything about the ethics of forcing creatures, who would naturally lay approximately 20 eggs per year into laying nearly 300 eggs per year.

275.    Neither HFAC standards, HFAC Program Policy Manual, nor Defendant address the ethics of Defendant's and its growers' practices of altering and accelerating the complex hormonal relationships that take place in pregnancy, birth, and bonding of the animals—while they forcefully repeat those activities on the same bodies over and over.

276.    Neither HFAC standards, HFAC Program Policy Manual, nor Defendant address the ethics of Defendant's and their growers' practice of destroying animals' families and social structures with the resultant psychological damage on those animals and families.

---

[31] https://certifiedhumane.org/how-we-work/program-policy-manual/

277.    What Defendant and HFAC conceal from the marketplace is that many of the hens' bones are so brittle from osteoporosis—caused by continuously leaching calcium from their bodies—that some of their bones are as brittle as potato chips.

278.    HFAC and organizations like it do not enhance animal protection or welfare in the United States. In a worldwide ranking in 2020[32] by World Animal Protection that uses the Animal Protection Index, the United States received a "D" grade. Worse, in the area of farming, the United States received an "E" grade, stating, *inter alia*, "[n]o federal legislation exists that protects farmed animals during rearing."[33]

279.    Defendant and HFAC exploit the weaknesses in United States law while using private "certifications" as a means to fulfill business opportunity in those weaknesses.

280.    Defendant's use of "Certified Humane®" masks and perpetuates the ongoing atrocities committed against hens and baby chicks who suffer their devastating fate simply by being born into Defendant's business operations.

281.    Nevertheless, Defendant violates the "guidelines" of Certified Humane® by failing to meet its definition of "Pasture Raised" during this Avian Flu outbreak.

282.    In its HFAC Laying Hen Standards, updated August 30, 2020, HFAC acknowledges the horrific realities of such animal farming to include cannibalism (and the "appalling" pain and suffering by being pecked to death), bone fractures and keel bone deformation, trapping, defective bones, jaws, lesions, fowl mite infestation, disease, infection, lameness, and culling.

---

[32] World Animal Protection. Animal Protection Index. API 2020
https://dkt6rvnu67rqj.cloudfront.net/cdn/ff/uziZnGpAf4IqLMhKmZN_-
XPDKWyCsRfACOEoDoF7RCA/1583531797/public/media/AnimalProtectionIndex2020_2.pdf
[33] Id at 12 citing David J. Wolfson, "*Beyond the Law: Agribusiness and the Systematic Abuse of Animals Raised for Food or Food Production*."

283. Through its Certified Humane® logo, Defendant communicates to consumers that the humaneness of the treatment of its hens are audited and measured, rendering illogical any claim by Defendant that its humaneness and ethics representations are vague, aspirational, lack specificity, or constitute opinions.

## J. Consumers Surveys Showing they are Materially Influenced by "Humanely Raised" Advertising Claims

284. American consumers increasingly identify the welfare and protection of food animals as a major area of concern, both politically and as criteria for food selection.[34]

285. The public is willing to pay more for food that is labeled "Humanely Raised." A 2007 survey by Public Opinion Strategies found that 58 percent of consumers would spend an additional 10 percent or more for meat, poultry, eggs, or dairy products labeled "Humanely Raised."[35]

286. Beginning in the mid-2000's, consumer preference for food from humanely treated animals created a market for products with holistic animal welfare and environmental label claims such as "Humanely Raised," "Humanely Handled," and "Sustainably Farmed," along with a variety of other claims.[36]

---

[34] The welfare and protection of animals raised for food was seen as very or somewhat important by 79 percent of respondents to a survey managed by the Humane Research Council. Humane Research Council, Animal Tracker – Wave 112 (2008), available at http://www.humaneresearch.org/content/animal-tracker-wave-1-june-2008. 73 percent responded that they would support a law requiring that farm animals, including, pigs, cows, and chickens, be provided with enough space to behave naturally.

[35] Frequently Asked Questions, American Humane Certified, http://www.humaneheartland.org/faqs (last visited Mar. 1, 2014). Additionally, consumer surveys by the Animal Agriculture Alliance in 1993, 1998, and 2004 demonstrated that American shoppers are willing to pay more for food labeled "humanely raised." In 2004, 31 percent of respondents were willing to pay 5 percent more and 23 percent were willing to pay 10 percent more. Animal Agric. Alliance & Nat'l Corn Growers Ass'n, Consumer Attitudes about Animal Welfare: 2004 National Public Opinion Survey 13(2004).

[36] The Kroger Co.'s Simple Truth line of products, launched in 2012, includes an unverified "humane" claim on its natural chicken. The company disclosed recently that sales of the Simple

287.    When asked, "what is the most you are willing to pay for high quality, humanely raised products," 34% of respondents to a 2013 survey conducted by American Humane said 10-20% more, while 28% of respondents said they would pay 20-30% more.[37]

288.    93% of the population opposes the suffering of animals raised for food, and 90% oppose factory farming when asked their opinion, according to a Global Stewards public opinion survey, "*U.S. Public Opinion Survey Results on the Environment, Trade, and Campaign Finance Reform*."

289.    In another customer survey, 76% say that animal welfare is more important to them than low meat prices.[38]

290.    Most or all of American consumers surveyed agree that animal suffering is unacceptable, and that farmed animals deserve legal protections. When surveyed, 96 percent of Americans say that animals deserve legal protection,[39] nearly two-thirds advocate passing not only laws but "strict laws" concerning the treatment of farmed animals.[40]

291.    About 40% of the respondents believed ethical and moral considerations should be primarily used to determine how to treat farm animals, but about 45% believed scientific measures of animal well-being should be primarily used to determine how to treat farm animals.[41]

292.    Food labels and advertising are theoretically used to help consumers make educated purchasing decisions.

---

Truth line have grown at an "astonishing pace." K. Nunes, Kroger's Simple Truth Simply Astonishing, MeatPoultry.com (Mar. 7, 2014).

[37] Humane Heartland Farm Animal Welfare Survey, American Humane Association, 2013.

[38] Jayson L. Lusk et al., "Customer Preferences for Farm Animal Welfare: Results of a Nationwide Telephone Survey," Oklahoma State University, Department of Agriculture Economics, August 17, 2007, ii, 23, 24, available at https://cratefreefuture.com/pdf/American%20Farm%20Bureau-Funded%20Poll.pdf.

[39] David W. Moore, "Public Lukewarm on Animal Rights: Supports strict laws governing treatment of farm animals, but opposes ban on product testing and medical research," Gallup Service, May 21, 2003, https://news.gallup.com/poll/8461/public-lukewarm-animal-rights.aspx (accessed May 19, 2022).

[40] *Id*.

[41] *Id* at ii.

293.    If consumers do not know the meaning of label claims—and have no ability to access that information—an educated consumer base does not exist and companies like the defendant are able to mislead them.

294.    Since consumers are becoming increasingly aware of the realities in farmed animal welfare—and demonstrating more awareness and compassion in their purchasing choices—the Defendant exploits the consumer market places to induce sales of products that it knows to be mislabeled and falsely advertised.

### K.    Plaintiff's Standing and Injuries

#### 1.    Frustration of Purpose

295.    Plaintiff works hard to honor the growing movement of ethical veganism while Defendant materially hinders that movement through a massive campaign of false advertising.

296.    Defendant intentionally uses "ethics," "ethical," and "humane," advertising with the foreseeable consequence of inviting this challenge by Plaintiff who practices animal ethics and ethical veganism.

297.    By deceiving the public on these matters of important public interest, Defendant deliberately obstructs Plaintiff's mission of mitigating animal suffering.

298.    Plaintiff educates the public about the need to resist the oppression and exploitation of animals while Defendant actively oppresses and exploits animals while claiming the opposite.

299.    Plaintiff conducts seminars, presentations, marketing campaigns, phone calls, meetings, and engages animal-ethics experts, among other things, to counteract the deceptive narrative advanced by Defendant.

300.    Plaintiff and its officer(s) and staff have dedicated their ecareers to animal welfare and therefore have longevity and commitment to reducing the suffering of animals including those within Defendant's business operations.

## 2. Diversion of Resources

301.    In at least eight presentations, COMPASSIONATE LIVING has used Defendant's marketing as examples of how false advertising perpetuates humane-washing.

302.    In carrying out research, COMPASSIONATE LIVING, through Hope Bohanec, and at least one other constituent or associational member had bought Defendant's eggs to fully examine the product, its claims, and the consumer experience.

303.    COMPASSIONATE LIVING and said constituent or associational member had suffered injury-in-fact that they would not have otherwise been exposed to.

304.    Although the product sales themselves do not form the basis of this action, they represent additional, traceable, and particularized injuries sustained in furtherance of COMPASSIONATE LIVING's mission.

305.    Every time COMPASSIONATE LIVING presents on Defendant's products, the audience continues to be subjected to emotionally charged representations that continue to cause the audiences, constituents, and associational members emotional injury.

306.    COMPASSIONATE LIVING with at least 178 podcast listeners in New York, and more worldwide, needs to spend time orchestrating legal experts, industry experts, dietary experts, film makers, and journalists to help dispel the false narrative used by Defendant and companies like it.

307.    In the current highly pathogenic avian-flu outbreak, Defendant's current practices of depopulation and intensive confinement are particularly obstructive to Plaintiff' missions.

308.    Defendant's practices contribute to a worsening of the outbreak, and provoke higher urgency to mitigate suffering and prevent unnecessary death.

309.    Domestic birds can also harbor a large reservoir of such avian flu strains that originate in aquatic birds, such as wild ducks, geese, and gulls.

Case 1:22-cv-05545-GHW  Document 1-1  Filed 06/29/22  Page 42 of 56

310.    In cases of H5N1—like the one that exists now that affects Defendant's birds—threats exist of the creation of new viruses highly contagious to pigs and humans.

311.    Defendant is in the business of increasing demand for animal products, and increasing such "demand for meat, eggs, and diary is a 'primary factor' influencing merging zoonotic diseases."[42]

312.    Plaintiff is a member of the public who is chartered to counteract the injurious consequences of animal rearing and slaughter.

313.    Defendant's uniquely harmful campaign of disinformation have altered Plaintiff' day-to-day business operations to commence this action.

314.    Plaintiff is forced to expend time, resources, and energy counteracting Defendant's uniquely harmful marketing.

315.    Plaintiff receives donations from the public to mitigate the harm caused by Defendant's uniquely harmful advertising practices.

316.    Plaintiff was not chartered to litigate a case such as this, and this litigation represents a diversion of Plaintiff's daily activities.

317.    This litigation is a) germane to Plaintiff's organizational purpose and goals 2) is needed to bring its members together, and 3) reconcile members' concerns.

### 3.    Other injuries to Plaintiff and their members and constituents

318.    Defendant's business aim is to reduce production costs to a minimum while it externalizes its costs, such as environmental degradation, animal suffering, and human disease inherent in its business model.

---

[42] *Report of the WHO, FAO, OIE, Joint Consultation of Emerging Zoonotic diseases: In collaboration with the Health Council of the Netherlands*, World Health Organization, Food and Agriculture Organization of the United Nations, World Organization for Animal Health, Geneva, Switzerland, May 3-5, 2004, https://apps.who.int/iris/bitstream/handle/10665/68899/WHO_CDS_CPE_ZFK_2004.9.pdf?sequence=1&isAllowed=y

41

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 43 of 56

319.    Aside from the devastating externalized costs of Defendant's business operations, consumers are duped into paying super premium prices based on false, deceptive, and misleading promises.

320.    Plaintiff and its members, affiliates, and/or constituents subsidize Defendant's activities, including the inhumane mass killing of birds during the current avian-flu outbreak, which they find ethically repugnant.

321.    The organizational plaintiff represents members, affiliates, and/or constituents who absorb the hidden costs of Defendant's objectionable practices.

322.    By falsely labeling, advertising and promoting its products and itself, Defendant has been able to deceptively and tortiously capture share and sales, harming the general public, as well as harm to the plaintiff and its mission.

323.    Plaintiff and Defendant are aware that avian influenza outbreaks have caused numerous, devastating illnesses, such as the 1918 Spanish flu pandemic that was caused by an H1N1 virus with genes of avian origin.

324.    Defendant's business activities increase the chances of causing or contributing another pandemic of avian origin, which further obstructs Plaintiff missions and resources.

325.    Plaintiff and its constituents have a perpetual interest in stopping activity that could cause or contribute to another such pandemic.

## FIRST CLAIM FOR RELIEF
### (NYGBL § 349)
### (Deceptive acts and practices unlawful)

326.    The plaintiff repeats, reallege and incorporates by reference the foregoing paragraphs.

327.    NYGBL § 349 declares unlawful and deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing any service in the State of New York.

328.    A plaintiff who brings an action under the statute must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act.

329.    NYGBL § 349 is directed at wrongs against the consuming public, and it allows a private right of action by any person who has been injured by a violation of the statute.

330.    In addition to the right of action granted to the attorney general, any person who has been injured by reason of any violation of the prohibition against deceptive trade practices may bring an action "in his or her own name to enjoin such unlawful act or practice, an action to recover his or her damages, or both such actions."

331.    Defendant's acts and practices are directed entirely at the consuming public and the consumer marketplace.

332.    For purposes of NYGBL § 349, deceptive or misleading representations or omissions are defined objectively as those likely to mislead a reasonable consumer acting reasonably under the circumstances.

334.    NYGBL § 349 is meant to empower consumers or other qualified "persons" such as Plaintiff to even the playing field of their disputes with better funded and superiorly situated fraudulent businesses.

335.    New York law provides remedies, including private rights of action, for misbranding food under consumer protection laws, such as GBL § 349, which broadly prohibits use of 'deceptive acts or practices' in business dealings in New York.

336.    NYGBL § 349 is focused on a seller's deception and its subsequent impact on consumer decision-making—not the consumer's ultimate use of the product.

337.    A party need not necessarily be a "consumer" or a natural person to avail itself of the statutory remedy, so long as it can show that it suffered a detriment or injury as a result of the

43

defendant's acts or practices, and that the defendant's conduct affects the public interest, or is consumer-oriented conduct having a broad impact on consumers at large.

338.    A reasonable person acting reasonably would have been materially misled by the defendant's advertising claims.

339.    Reliance is not an element of a claim under the statute, nor is intent to defraud.

340.    Defendant's practice of selling mislabeled and misbranded poultry in this way has the capacity and tendency to deceive and mislead a significant percentage of consumers in a material way because the practice induces consumer purchases by manipulating public trust and vulnerabilities.

341.    The defendant's extensive and deceptive marketing scheme as set forth above continues to a) reduce transparency of the real treatment of animals during the animal-production process, oftentimes also considered Concentrated Animal Feeding Operations (CAFOs); b) produce invisibility in its suppliers' treatment of animals in animal production; c) alters and maintains false and misleading perceptions, beliefs and schemas relating to the real treatment of animals in animal production; and d) disconnect consumers from the realities of what takes place at CAFOs and in animal production.

342.    Defendant's use of social media and retailers to spread the above messaging is a deceptive business practice.

343.    Defendant's deception is presumed from its claims' literal falsity or the plaintiff's misinterpretation of the defendant's facially ambiguous claims.

344.    Defendant's advertising claims, considered in their totality, are not fairly balanced to enable reasonable consumers to make informed choices.

345.    Defendant's "humane-washing," which diverts, distracts, and detaches consumers from the realities of modern-day meat agriculture, is a deceptive act and practice.

346.    Defendant manipulates conscious-minded consumers to shift their feelings of humanity, benevolence and empathy by continuing to portray a violent ideology into a non-violent ideology.

347.    Defendant deceptively persuades morally conscious consumers into being complicit in their own deception.

348.    Defendant's psychological acrobatics psychically numb Plaintiff' audience to their justified cognitive dissonance.

349.    Defendant confuses morally aware consumers into acting against their interests.

350.    Defendant manipulates consumers into becoming end users that enable the violence that they seek to prevent.

351.    As a result of these violations of NYGBL § 349, the plaintiff is entitled to recover actual damages, an injunction in the proper court, costs and reasonable attorneys' fees pursuant to NYGBL § 349(h).

**Injunctive Relief Warranted under NYGBL § 349(h) and NYGBL § 350**

352.    The New York State legislature amended both NYGBL §§ 349 and 350 to add a private right of action for money damages, *injunctive relief* and reasonable attorneys' fees.

353.    The statute reads in relevant part

General Business Law § 349    Deceptive acts and practices unlawful

...

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may    award    reasonable    attorney's    fees    to    a    prevailing    plaintiff.

45

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 47 of 56

354.    Defendant's animal products containing the above advertising claims are sold at retailers all over New York State.

355.    Defendant's animal products containing the above advertising claims are also sold online to consumers in New York through online retailers such as Amazon Fresh, Instacart, Target, Fresh Direct, Whole Foods, and Blue Apron.

356.    Without injunctive relief, Plaintiff and/or its constituents will be unable to shop for basic groceries and provisions in many New York grocery stores without being confronted by the defendant's injurious, false and misleading advertising claims.

357.    Plaintiff and/or its constituents are targeted at the above stores by the defendant.

358.    Plaintiff and/or its constituents physically witnesses the falsely advertised products, which are aimed at convincing them and the community of facts that are harmful, unlawful, threatening, recurring, and imminent.

359.    The public at large—which includes the plaintiff—need not actually be "consumers" as restrictively defined in other contexts in order to suffer injury and future injury for purposes of seeking an injunction.

360.     The public at large—which includes the plaintiff—need not justifiably rely on the advertising claims to be actionable for purposes of seeking an injunction.

361.    The public at large—which includes the plaintiff—will suffer future detriment and injury by witnessing the false and injurious advertising claims.

362.    Without injunctive relief, the advertising claims will continue to mislead consumers into believing they are supporting a company whose practices align with their values.

363.    If allowed to continue without injunctive relief, Defendant's advertising claims will continue to reduce transparency and influence consumer decisions in ways that are contrary to public interest, and contrary to Plaintiff' missions.

364.    If allowed to continue without injunctive relief, millions of New Yorkers will continue to be irreparably deceived and misled on matters of important public interest: animal welfare, animal protections, and animal ethics.

365.    New York State has a strong public interest in truthful advertising in the area of animal-welfare advertising.

366.    The public interest of New York State outweighs the defendant's commercial need to publish its untruthful advertising.

SECOND CLAIM FOR RELIEF
**(NYGBL §§ 350 and 350-a)**
**(False advertising unlawful)**

367.    Plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs.

368.    False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service is unlawful.

369.    The statute applies to virtually all economic activity, and New York courts apply the statute broadly.

370.    The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms, or conditions of any employment opportunity if such advertising is misleading in a material respect. NYGBL § 350-a (False advertising).

371.    The allegations asserted in this complaint amount to false advertising under NYGBL §§ 350 and 350-a.

372.    Defendant uses its false representations to psychologically distort, distance, and detach consumers from reality to induce sales for profit.

373.    The false statements were made solely with the intention to influence consumer opinion about Defendant's eggs with the goal of increasing its market share in the pasture-raised egg market.

47

374. Defendant's practice of deceiving consumers using false video clips in it traceability marketing is false advertising, as well as a deceptive practice.

375. As a result of these violations of NYGBL § 350, Plaintiff is entitled to enjoin the defendant's unlawful advertising, recover actual damages, and award reasonable attorney's fees to the prevailing plaintiff pursuant to NYGBL § 350-e(3).


## THIRD CLAIM FOR RELIEF
### (Common law fraud and deceit)

376. The plaintiff repeats, realleges and incorporates by reference the foregoing paragraphs.

377. The elements of a fraud-and-deceit cause of action are 1) representation of an existing material fact; 2) falsity; 3) *scienter*, 4) deception; and 5) injury.

378. The above claims, including that of "pasture raised" are placed on millions of products in the State of New York.

379. Defendant knows that its claims are false, and does so to induce sales.

380. Defendant knows that consumers expect—and are entitled to expect—that the above claims, including the "pasture raised" claim to be true.

381. Defendant knows that its consumers or potential consumers expect a certain standard of care relating "pasture raised," "ethics," "ethical, and "humane" claims.

382. Defendant knows that consumers and potential consumers place trust in Defendant's representations, logos, and trademarks.

383. Defendant knowingly breaches that trust to induce sales.

384. Defendant knowingly retains its false "pasture raised" claims on millions of products when it knows that this claim is false in 2022.

385. Defendant has not recalled its falsely advertised and mislabeled packages and labels.

386.    Defendant does not place updates on its packages and containers to update the consuming public that its claim of "pasture raised" is false during this time.

387.    Upon information and belief, Defendant does not request that retailers remedy or correct the pasture-raised claims at points of purchase.

388.    Most or all retailers are not remedying the Defendant's knowingly false "pasture raised" claims during the current outbreak.

389.    Through affirmative misrepresentation representation, and through omission, Defendant induces its purchasers and retailers to refrain from correcting the "pasture raised" claims that Defendant knows to be false.

390.    Defendant's purchasers and retailers rely on Defendant's representations and instructions with regard to Defendant's legal responsibilities as to the veracity of advertising claims on the products that Defendant sells.

391.    Consumers and the public at large rely on Defendant's representations and instructions with regard to Defendant's legal responsibilities as to the veracity of advertising claims on the products that it sells.

392.    Defendant does not reasonably update its website or other digital marketing platforms to notify consumers or potential consumers that its "pasture raised" claims are false.

393.    Defendant possesses superior knowledge as to its practices, and the falsities of its representations.

394.    Defendant had the legal obligation to act when it knew that its "pasture raised" claims became irrefutably false.

395.    Defendant knowingly elected not to act to cure its knowingly false "pasture raised" claims because Defendant put its business interests first.

396.     Defendant's false representations made to the USDA, FSIS, AMS and/or the FDA, who relied on those representations to permit Defendant to use them, which formed actionable third-party reliance.

397.     Defendant's false, misleading, and deceptive statements made to the USDA, FSIS, AMS and/or FDA, and to its purchasers and retailers, who then relied on those statements to act or refrain from acting, formed actionable third-party reliance.

398.     Defendant and HFAC are complicit in the fraudulent proliferation of knowingly false "pasture raised" claims since HFAC defines, endorses, and certifies to the public that Defendant's hens are being "pasture raised" during the current outbreak when they know that they are not.

399.     Defendant and HFAC exploit the fact that the words "ethical," "humane," and "pasture raised" are not defined or regulated by the USDA, or by any other federal agency.

400.     Defendant contrives its own definitions and marketing narratives that it knows to be false, misleading, and deceptive in order to induce sales.

401.     At best, the FSIS, USDA, FDA, and/or AMS screen voluntary marketing claims for untruthfulness or misleadingness, but they lack the authority, capacity, and ability to screen for fraudulent claims.

402.     The defendant and HFAC know that the representations are false, and exploit the FSIS, USDA, FDA, and/or AMS for their lack of enforcement, capacity, and ability to protect consumers from deceptive express and implied messaging in Defendant's advertising.

403.     Defendant made the false representations recklessly without regard to whether they were true or false.

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 52 of 56

404.   Defendant made, and continues to make, the false representations for the purpose of inducing the USDA, FSIS, FDA, and/or AMS to grant pre-approval or blanket approval of its special statements for use on its packages, labels, and containers.

405.   Defendant made, and continues to make the false representations for the purpose of inducing sales, penetrating a market, building a brand, and swaying consumer beliefs and perceptions in a matter of important public interest.

406.   Under New York law, false statements under a fraud claim *need not* be made directly to an injured party if the injured party was intended to act – or *not act* – upon those false statements. Plaintiff acted on those false statements as alleged in this complaint.

407.   The USDA, FSIS, FDA, AMS, the public, and the commercial market in which Defendant operates, justifiably relied on the express and implied claims and promises made by Defendant relating to sufficiently reliable proof to substantiate its advertising claims at all material times.

408.   The recovery of punitive damages is warranted since the defendant's acts and practices, which evinced a high degree of moral culpability, are aimed at the general public.

409.   As a result of the defendant's fraud and deceit, Plaintiff suffered actual damages as set forth in this complaint.

## DEMAND FOR JURY TRIAL

Pursuant to Civil Practice Law and Rules § 4102 demands a trial by jury as to all issues so triable.

**WHEREFORE**, the plaintiff demands judgment against the defendant:

1.   Statutory damages, treble damages, compensatory damages, consequential damages, general damages, and punitive damages in the amount of $750,000.00. which exceeds the jurisdictional limits of all lower courts, which would otherwise have jurisdiction;

Case 1:22-cv-05545-GHW   Document 1-1   Filed 06/29/22   Page 53 of 56

2. Enjoining and restraining Defendant, its agents, servants and employees, and any other person acting in its name and stead, permanently from distributing, marketing, selling, and offering for sale in the State of New York the products referred to, and labeled using the words "ethics," "ethical," "humane," or "humanely" or "pasture raised," as alleged in this complaint while and as long as said labeling is false, deceptive, and misleading;

3. Requiring Defendant to disseminate corrective advertising and disclosures;

4. Reasonable attorneys' fees under NYGBL § 349(h) to be determined at a hearing; and

5. For such further and other relief as may be just.

Dated: June 10, 2022

Defendant:

Vital Farms, Inc.
3601 S. Congress Avenue, Suite C100
Austin, Texas 78704

_____
Jesse Langel, Esq.
The Langel Firm
Attorney for Plaintiff
30 Wall Street, 8th Floor
New York, NY 10005
646-290-5600
Email: jesse@langellaw.com

**Vital Farms**

▼ FIND US     ▼ ORDER ONLINE     OUR PRODUCTS ⌄     OUR FARMS     ABOUT US     THE VITAL NYSCEF

Exhibit 1

# An Update On Avian Influenza

## MARCH 28, 2022

We want to update our stakeholders on Avian Influenza, a virus that affects chickens and has been recently reported in the UK and U.S. For background, avian influenza occurs when migratory waterfowl pass over farm areas and leave droppings containing the virus. First and foremost, we're thinking of any farmers and animals that have been affected by this virus.

Our Farm Support crew has been following this virus since cases were first reported in Europe several months ago. We've been working with our farmers, veterinary partners, and government health officials to protect the health of our girls. We also sought guidance from our animal welfare auditors including Certified Humane® and Oregon Tilth to ensure any approach we take has their approval as it relates to animal welfare standards.

At this time, our veterinary partners, certifying bodies, and state health officials have strongly recommended that we keep our hens indoors, and we are following this guidance. We've also implemented heightened biosecurity measures across our network of 275 farms. Because avian influenza is spread by wild migratory fowl, hens with outdoor access could be particularly vulnerable. We shared this decision with our auditors who agree with this approach. While the hens are inside the barn, our farmers continue to prioritize animal welfare which includes carefully managing barn ventilation and providing high-quality foraging materials and enrichments.

While we hope the girls will be out on pasture again soon, we believe this is the best approach to keep them as safe as possible.

## RECENT POSTS


**Gooey Butter Cake**
May 18, 2022


**Double Eagle Farms**
May 18, 2022


**Butter Molds**
April 7, 2022


**Buffalo Deviled Eggs**
April 4, 2022


**Mini Lemon Blueberry Muffins**
April 4, 2022

STAKEHOLDER STORIES     RESOURCES     VITAL KITCHEN     PRESS

FILED: NEW YORK COUNTY CLERK 06/10/2022 04:53 PM

NYSCEF DOC. NO. 3

INDEX NO. 154929/2022

RECEIVED NYSCEF: 06/10/2022



 **FIND US**    **ORDER ONLINE**   OUR PRODUCTS ⌄   OUR FARMS   ABOUT US   THE VITAL KITCHEN

# LAY THEE DOWN TO REST

## Exhibit 2

Vital Farms began with one small family farm and a simple goal in mind: to give laying hens the highest quality of life possible. We knew that if we did that, then everything else would follow – sustainable land use, beneficial relationships with the farmers that we work with, and ultimately an amazing tasting egg. This approach is part of our 'stakeholder model', and it informs every decision we make.

But, farming is not always as straight forward as the picture postcard of hens roaming in fields of flowers. There are biological realities, and there are economic realities, and oftentimes the two of those collide. We've prided ourselves of never taking the easy way out, and doing what we can to change our small corner of the farming world whenever we see the opportunity.

Last year for example, we invested significantly into an initiative which is seeking a viable solution to end male chick culling. Although this has now been spun off into a separate business, it was an important project for us to invest in and undertake, and we're hopeful that our industry leadership will contribute to a more humane way of handling chicks at the beginning of their lives.

When female chicks do grow up and come to our farms, we think they live just about the best life possible for a laying hen to have – acres of open pasture, fresh green grass and the freedom to come and go from comfortable barns as they please.

But as the amount and quality of eggs our hens lay decline with age, the economic realities of farming mean that those summer days must eventually draw to a close. In our early days, when Vital Farms had just a couple of farms located near urban areas, we'd simply place an advertisement on Craig's List and find homes for our retiring ladies with backyard farmers.  Today, due to the rural locations of our family farms, that method no longer makes sense. So when retirement time comes, the farmers that we work with have little choice but to 'retire' the flock en masse. That currently means just one thing – and not to sugar coat it – the flock is euthanized, either on site at the farm or at a nearby slaughter plant. And while we conduct this process as humanely as we are able, the end result is still, unavoidably, the same. If we ever suspect any of our farmers or support crew failing to adhere to our standards, we conduct thorough investigations and take the necessary corrective measures. That is indeed something we discovered had happened recently with a third party contractor, who as a result was immediately terminated.

We consider the end of our hens lives as sacred as the rest of their time with us. In the past we have been able to offset this forced retirement through donations of the birds to overseas food programs, but for a number of reasons, including a plant closure and current FDA restrictions in the wake of devastating Bird Flu outbreaks this option is now very limited .

Which is why we are excited as a company to be embarking on a renewed mission to figure out the absolutely best way to treat hens at the end of their laying life. We're seeking input and advice from experts across a variety of fields, and around the world, to gather best practices, assess the most viable alternatives and determine what works the best for the hens, the farmers and the communities at large.

There's no idea we'll leave unchecked! Whether it be sanctuary farms, humane euthanization methods or the donation of living hens to food aid programs, we are going to be as thorough and as ethical in this investigation as we are with all of our farming practices.

Says Russell Diez-Canseco, President and COO of Vital Farms, "We want to know that these wonderful creatures that we hold stewardship for have been given the best conditions possible, from the time they are hatched as chicks, to the end of their lives."



# FAQS

## ABOUT OUR EGGS

**HOW IS PASTURE-RAISED DIFFERENT FROM FREE RANGE OR CAGE-FREE?**

Pasture-raised eggs are laid by hens that spend their days outdoors roaming the pastures as they please. Our pasture-raised girls get a minimum of 108 square feet EACH — unlike free range and cage-free birds that have far less freedom.  Free range hens typically get a minimum of 2 square feet per bird and have limited access to the outdoors. Cage-free birds get a minimum of 1.2 square foot per bird and may rarely, if ever, see the sunlight. We make sure our girls have access to fresh air and sunshine year-round.

In certain situations, when the health and safety of the girls are at risk, we may have to keep them temporarily indoors. We make these decisions based on state and local guidance as well as the guidance of our veterinary partners and Certified Humane, who audits our animal welfare practices. These situations are rare and only in the event of significant risk to the girls, such as a weather or health emergency.

Exhibit 3